CITY OF LITTLE ROCK *v.* SOUTHWEST BUILDERS, INC.

5-564                                                    276 S. W. 2d 679

Opinion delivered March 28, 1955.

O. D. Longstreth, Jr., Dave E. Witt and Moore, Burrow, Chowning & Mitchell, for appellant.

H. B. Stubblefield, for appellee.

GEORGE ROSE SMITH, J. By its complaint in this case the appellee seeks to compel the city of Little Rock to issue a building permit for the construction of a $28,500 residence on Lot 23 in Edgehill Addition. The city defends its refusal to grant the permit on the ground that the proposed construction would violate the municipal zoning ordinance. The principal defense, however, is interposed by several neighboring property owners who intervened in the case. The intervenors contend that any construction at all upon Lot 23 is prohibited by the original plat and bill of assurances for the addition. The chancellor rejected both defenses and granted the relief sought.

We consider first the contentions of the intervenors. In 1926 Edgehill was dedicated as a restricted residential district. This is the pertinent language of the bill of assurances that accompanied the plat of the addition:

"All plots or lots in said Addition when sold shall be subject to the following restrictions:

"(a)   All plots in said Addition shall be restricted to single family residences only.

\*   \*   \*   \*   \*

"(d)   No plot or lot shall contain more than one residence.   All residences in said addition shall be erected so as approximately to face the front building line indicated on said plat or map, and no building or other structure shall be erected closer to any street, drive or road indicated on said plat or map than the building line shown on said plat or map   .   .   ."

The intervenors' argument centers upon the fact that Lot 23 occupies a unique position in the addition, in that it is the only lot for which the plat shows no front building line.   We insert a simplified sketch of enough of the plat to show how the building lines were terminated before reaching Lot 23.

Quite apart from certain oral evidence that will be mentioned later, the intervenors insist that the plat and bill of assurances were alone sufficient to prohibit all construction upon Lot 23. Their argument is this: The bill of assurances forbids the erection of any structure closer to the street than the front building lines shown on the plat. The plat shows no building line whatever for Lot 23. It follows, say the intervenors, that all construction upon that lot is forbidden.

We do not find this argument persuasive. If we look to the plat alone, the fact that the building lines were not carried into Lot 23 creates at most an ambiguity. It could be inferred that the absence of a building line was intended to prohibit the act of building, but it might also be supposed that the absence of this line implied a corresponding absence of the restriction that the lines were designed to impose. The latter conclusion is supported by the practical consideration that residential additions are ordinarily dedicated with a view to the development of the property rather than for the purpose of perpetuating the land as vacant lots. Although the plat discloses that Lot 23 is the smallest lot in Edgehill, the lot comprises more than 8,000 square feet and is certainly sufficient to accommodate a one-family residence.

Any doubt that might arise from the plat is dispelled by a study of the accompanying bill of assurances. We have quoted the brief reference to building lines, but this really does nothing except to put into words what the plat expresses pictorially. If the proprietors of the addition meant for Lot 23 to remain a useless piece of ground for the indefinite future, one would expect— indeed, a prospective purchaser would have the right to expect—that this intention be declared in plain language. Yet nowhere in the bill of assurances is Lot 23 singled out from the other forty-one lots in the subdivision. It is declared, for example, that *all* lots shall be subject to the various restrictions, one of which is that no lot shall contain *more* than one residence. Thus the bill of assurances strongly confirms the view that all the lots were

dedicated for building purposes and contains not a syllable of warning that Lot 23 was to remain unimproved.

The intervenors were allowed to introduce parol evidence to show that the dedicators of Edgehill did not intend for Lot 23 to be used as a residential site and to show that the intrusion of a house upon this relatively small lot would be aesthetically out of harmony with the neighborhood, even to the point of reducing property values in the vicinity. It is not contended that the proprietors' undisclosed intention would bind the public at large. Rather, it is argued that the appellee bought with notice of the proprietors' true intention, since its president had been informed before the purchase that there was some controversy about the right to build on the lot. Even so, the intervenors' protest is not helped by this proof. A complete investigation by the appellee might have uncovered the dedicators' unexpressed plans for Lot 23, but it would also have disclosed that those dedicators had long since sold the lot and were therefore powerless to correct the original oversight. Thus when the appellee invested $8,500 in the purchase of Lot 23, it did so merely with notice that its right to build involved a disputed question of law. That one buys property with notice of a legally doubtful claim does not preclude him from asserting its invalidity.

In the absence of a restriction imposed by contract the appellants' objections, whether aesthetically sound or not, must find support in the zoning ordinance, which brings us to the city's contentions. The zoning law requires that back yards in a district such as this be at least twenty-five feet in depth, and it is contended that the appellee's application for a building permit contemplated a slightly smaller back yard for the proposed residence. The chancellor would have been justified in holding that this contention had been abandoned during the trial, but in any event the defect was cured by the decree, which approved a revised plan that conforms to the ordinance. Any inconvenience that the city may have suffered can be corrected by awarding the city its costs, which have been nominal.

Also cited is this provision in the zoning law: "Where lots comprising forty per cent or more of the frontage are developed with buildings having an average front yard with a variation in depth of not more than six feet no building hereafter erected . . . shall project beyond the average front yard line so established." The proof is that on the north line of the block now in question Lots 15 and 17 were first improved, that they constitute more than forty per cent of the north frontage, and that their front yards are respectively 65 and 57 feet in depth. It is said that these facts establish an average depth of 61 feet, that neither Lot 15 nor Lot 17 varies from the average by as much as six feet, and that therefore the appellee cannot build within twenty feet of the street, as the ordinance would otherwise permit. It is hard to be sure what this brief excerpt from the ordinance means by "the frontage" or by "an average front yard." It is plain, however, that the ordinance specifies a variation in depth and not, as the city would have it, a variation from the average depth. Since the actual variation between the front yards of Lots 15 and 17 is more than six feet, it cannot be said that these pioneer houses established a line having that degree of uniformity which the ordinance requires.

Affirmed.

McFADDIN, J., not participating.

HOLT and MILLWEE, JJ., dissent.

J. SEABORN HOLT, J., dissenting. So strongly do I feel that a grave injustice is being done the property owners in this restricted residential addition, that I am impelled to dissent.

In 1926, the owners platted Edgehill Addition to the City of Little Rock and on May 7th of that same year filed and had recorded the above Plat and along with it (on the same day) a Bill of Assurance. This Addition contains 42 lots and the smallest plot 23, involved here, has an area of 8,000 sq. ft., while the next smallest has an area of 25,000 sq. ft. Each plot is limited to one residence to cost not less than $15,000 and no residence can be built

less than 40 ft. from the curb line of the street on which the building fronted as I interpret the plat. All the present homes in the Addition have complied with this restriction, some as far back as 80 ft., and all of them at a greater distance than 40 ft. from the street. The Bill of Assurance recites, among other things, that the owners of the property "have caused the same to be surveyed into plots, streets, roads, parks, and easements as shown on the Plat or Map hereto annexed and made a part thereof": that "said Addition as laid off shall be composed of plots or lots numbered as follows . . . 14 to 39 inclusive . . . "; that all conveyances of any plot or lot mentioned on said Plat or Map shall carry the fee thereof to the boundaries thereof . . . and shall be made subject to all the restrictions, conditions, limitations, and reservations and easements shown on said Plat or Map or mentioned in this instrument and the purchaser of such plot or plots or part thereof shall take title to the same subject to all such restrictions, conditions, limitations, and reservations whether mentioned in the deed of conveyance or not and said restrictions shall and are hereby deemed to be made for the benefit of the grantors herein, their heirs and assigns, and all owners of and persons having an interest in any of the plots or lots included within said Addition. . . .

"All lots or plots in said Addition, when sold, shall be subject to the following restrictions:

"(A) All plots in said Addition, shall be restricted to single family residences only and no business, amusement house, school, church, club, lodge, store, restaurant, hotel, filling station, or commercial use or structure or nuisance may be built or maintained at any time upon any plot within said Addition and this clause shall be taken to include boarding houses, tenements or apartment houses, inns, hotels, eating houses and restaurants.

"(d) No plot or lot shall contain more than one residence. All residences in said Addition shall be erected so as to approximately face the front building line indicated on said Plat or Map and no building or

other structure shall be erected closer to any street, drive or road indicated on said Plat or Map than the building line shown on said Plat or Map and no structure shall encroach upon the easements shown on said Plat or Map.

"The grantors, their heirs and assigns, shall have and hereby reserve full power and authority to prevent any infringement and to enforce performance of any of the conditions, limitations, restrictions, and reservations contained in this instrument, but this right is intended to be cumulative and not to restrict the right of any plot or lot holder to proceed in his own behalf against any person violating or threatening to violate any of said restrictions; and each of the conditions, limitations, and restrictions and reservations hereinbefore set forth shall be independent of the other. . . . The restrictions, limitations, conditions, and reservations herein shall operate as covenants running with the land into whosoever hands the same or any part thereof shall come and said restrictions shall be enforceable at the suit of any and every owner at any time of any plot or lot or of the grantors, their heirs and assigns, by proper proceeding at law or in equity."

In 1937, the City of Little Rock enacted a Zoning Ordinance, which provided: "There shall be a front yard having a depth of not less than 25 feet to the front line of the building;

"There shall be a rear yard having a depth of not less than 25 feet provided, however, that for lots less than 125 feet in depth and of record at the time of passing of this ordinance the rear yard requirement shall be reduced to 20% of the depth of such lot.

"Where lots comprising 40% or more of the frontage are developed with buildings having an average front yard with a variation in depth of not more than six feet no building thereafter erected or structurally altered shall project beyond the average front yard line so established provided further that in the A-1 Family District this regulation shall not be so interpreted as to require a front yard of more than 75 feet."

As I read the record, the great preponderance of the testimony shows that all the property owners in this Addition, who built expensive residences, did so in reliance, as they had a right to do, on the Plat and Bill of Assurance, which guaranteed to them an exclusive and controlled residential district, of large plots and spacious lawns. Such was the clear intention of the owners who created the district and of all who have erected homes therein.

The purpose of the Bill of Assurance is to be determined from reading it as an entirety and, as appellee suggests, from considering the circumstances existing at the time of the creation of the restrictions.

"Interpretation of restrictions according to apparent purpose. The rules governing the construction of covenants imposing restrictions on the use of realty are the same as those applicable to any contract or covenant, including the rule that, where there is no ambiguity in the language used, there is no room for construction and the plain meaning of the language governs. When construction is necessary, the language used will be read in its ordinary sense, unless the context shows that it was used in a different sense, and the restriction will be construed in the light of the circumstances surrounding its formulation and imposition and with the idea of effectuating its object, purpose, and intent. Restrictions are to be fairly and reasonably interpreted according to their apparent purpose. On the one hand they are not to be construed narrowly, and on the other hand they are not to be unduly enlarged. All doubt should generally be resolved in favor of the free use of the property and against restrictions; but this rule of construction will not be applied to defeat the obvious purpose of a restriction placed on the use of property. Restrictions on the use of property should be given the effect which the expressed language of the deed authorizes, when considered in connection with the circumstances surrounding the transaction and the object which the parties had in view at the time the instrument was executed. They are to be interpreted according to the apparent purpose or protec-

tion or advantage intended by those parties. The primary rule of interpretation is to gather the intention of the parties from their words by reading, not simply a single clause of the agreement, but the entire context, and, where the meaning is doubtful, by considering such surrounding circumstances as they are presumed to have considered when their minds met.'' 7 Thompson Real Property, Permanent Edition, § 3569.

Now, for the first time, the purchaser of plot 23, proposes to erect a residence on this V-shaped piece of ground 20 ft. from the street line in violation, as I see it, of the 40 ft. restriction shown on the Bill of Assurance and Plat. Appellee's deed, (as well as those of all other property owners in the Addition) to plot 23, contains this provision: ''This conveyance is subject to all of the provisions contained in the Plat and Bill of Assurance and Extension thereto to Edgehill, an addition to the City of Little Rock.''

The preponderance of the testimony shows that it was never the intention that lot 23 would ever be used for residential purposes for the simple reason that its area was obviously too small for the construction of any residence 40 ft. from the street line, as definitely required in this restricted addition.

The majority opinion, as I interpret it, is based on the conclusion that since the 40 ft. building line stops about 20 ft. short of the west division line between lots 21 and 23 and was not extended on to 23, therefore, the purchaser of 23 was not bound by the Plat or Bill of Assurance. Of strong significance is the admitted fact that these front building lines do not reach lot 23. Could it be contended that the owner of lot 21 could build closer to Armistead Road or Crestwood Drive than 40 feet on that part of lot 21 where no building lines are drawn? A mere glance at the Plat shows the reason this line was not so extended,—because it was obvious that this little V-shaped lot fronting on two streets was not large enough to provide a 40-ft. lawn space fronting on Armistead Road and Crestwood Drive. The law does not require the doing of a vain and useless thing.

Mr. Lund, the engineer who surveyed and prepared the Plat of this Addition, testified, in effect, that the front building line does not extend into lot 23 because it was not called for. There was no space there to build on in compliance with the plans that the owners had for the improvement. There is a front building line shown on the Armistead Road side of lot 21 and also a front building line shown on the Crestwood side of lot 21. Had these lines been extended, that would have left only a very small triangle on the west side of lot 23, too small on which to build.

Mr. Armistead, a prominent and able attorney, who had charge of the legal proceedings when Edgehill was platted, testified, in effect, that there is no building line shown on lot 23. The building lines on lot 21 do not actually come to a point. If they had been extended into lot 23 there would not have been room to build on. The reason that the lines were not extended into 23 was that the subdividers had the intention to have a park in that little triangle or a flower garden.

All of the present property owners in the division who testified (and there were many) stated that it was their understanding and intention that this small piece of ground would never be used for anything but a little park or flower garden. It is also undisputed that this lot was never provided with sewer connection as were all the other lots. This it seems to me is strong evidence that it was never intended as a building site. The platter of this Addition clearly intended that there were to be parks in the area and so provided in the Bill of Assurance, although on the Plat there is no area specifically labeled "park."

Even to concede, which I cannot do, that lot 23, in the circumstances, is a building site, then certainly, it would be encumbered with the same building restrictions as pertain to other building sites. So, if it is found to be a building site, the plans of appellee do not comply with the established front yard set-back requirement under the Zoning Ordinance in question.

As indicated, the plat of Edgehill shows the frontage on the south side of Armistead Road to be lot 15-150 ft.; lot 17-150 ft.; lot 19-150.5 ft.; lot 21-150.5 ft.; and lot 23-135 ft. Lots 15 and 17 comprise more than 40% of the frontage and are developed with buildings having an average front yard with a variation in depth of not more than 6 feet; lot 15-65 ft.; lot 17-57 ft. The average front yard is 61 feet and the front yard of each building is 4 ft. from that average.

The ordinance (of 1927) reads: "Where lots comprising forty (40) per cent or more of the frontage are developed with buildings having an average front yard with a variation in depth of not more than six (6) feet, no building hereafter erected or structurally altered shall project beyond the average front yard line so established. . . ."

Therefore, with reference only to the Zoning Ordinance no building can be erected or structurally altered on lot 23 which projects beyond the average front yard line of 61 feet distance from Armistead Road.

The restrictions established by the Bill of Assurance and Plat here cannot be affected by a subsequent zoning ordinance.

Under the terms of the Bill of Assurance and its purpose to create and maintain an exclusive and controlled residential district of large plots with spacious lawns, I think the omission of building lines and a sewer connection from lot 23 fixed it permanently as a non-building site—as effectively as if the platters had written across it "No Building Permitted."

"Nor can those who have acquired property in reliance upon restrictive covenants be deprived of this property right by subsequent zoning laws or ordinances, where no element of public health morals, safety or general welfare is promoted thereby. (Section 858)," page 471, and

"Section 870. Restrictions so established by private agreement are not displaced by subsequent zoning ordi-

nances of a less restrictive nature." 3 Tiffany, Real Property, 3rd Ed., p. 509.

In *Greenfield, et al., Executors,* v. *Stanley,* 207 Ga. 390, 61 S. E. 2 818, 21 A. L. R. 2d 1256, The Georgia Supreme Court, in a fact situation similar to the present one, involving a plat and a deed with restrictive covenants, held that a plat must yield to the specific provisions written in the deed or Bill of Assurance, saying: "A mere general reference in a deed to a plat which may logically serve as an identification of property by lot and block numbers must yield to specific provisions written in a deed in words and figures, dealing particularly with the subject of building line restrictions, although the plat shows a dotted building line across lots in the subdivision in a number of feet different from that expressed in the deed."

Not only did appellee have actual record notice of the limitations on lot 23, but he had notice of facts sufficient to put him on inquiry.

"The notice sufficient to charge a purchaser may be actual notice of the conditions or restrictions or notice of facts sufficient to put him on inquiry. It has been held sufficient that the purchaser buys with notice of a claim that there are restrictions. The uniformity of the position of all the houses which have been previously built for example, that they all front upon one line, has been suggested as 'probably' sufficient alone to put a purchaser upon inquiry. One who has actual knowledge of a restrictive building scheme is bound by the restrictions, notwithstanding his deed is without restriction. There is, however, some difference of opinion as to this." *14 Am. Jur.;* Covenants, Conditions and Restroctopms. Sec. 329, page 661.

I would reverse the decree and deny appellee the right to erect a residence on Lot 23.

Mr. Justice MILLWEE joins in this dissent.